UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DARLA MARIE SHEFFIELD, | § | |
| TDCJ #01769407, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 3:14-CV-322 |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

The petitioner, Darla Marie Sheffield (TDCJ #01769407), was recently released from the custody of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ") and is now in a halfway house (Dkt. 78). Sheffield has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging a state court conviction. Respondent Lorie Davis has filed a motion for summary judgment accompanied by the appropriate state-court records (Dkt. 62–Dkt. 64). Sheffield has responded (Dkt. 72).

After reviewing all of the pleadings, the record, and the applicable law, the Court concludes that the Respondent is entitled to summary judgment.

## I.   BACKGROUND

On January 26, 2012, a Galveston County jury convicted Sheffield of driving while intoxicated (Dkt. 62-2 at p. 21). Prior convictions for driving while intoxicated elevated the charge to a felony (Dkt. 62-1 at p. 6). *See* TEX. PENAL CODE §§ 12.42(a),

49.09(b)(2). The jury also found that Sheffield had used her car as a deadly weapon (Dkt. 62-2 at p. 22). Sheffield received ten years in prison (Dkt. 62-2 at p. 26).

Sheffield's DWI arrest was somewhat unusual in that it did not follow either a conventional traffic stop or, thankfully, a car crash; instead, it resulted from concerned citizens' calls to 911 to report a car driving erratically on Seawall Boulevard in Galveston ("Seawall") in the middle of the day on February 4, 2011 (Dkt. 62-8 at pp. 11, 29–30, 99; Dkt. 62-9 at p. 117). Sheffield, against the advice of her counsel, took the stand and insisted that, while she was drunk on the date of her arrest,[1] she did not drive (Dkt. 62-9 at pp. 144, 173, 180). Sheffield grounded that defense on the fact—and it is an undisputed one—that no police officer ever saw her behind the wheel. However, the State presented other witnesses at trial who did, including one man who testified that he was a passenger in her car until, frightened by her driving, he made her pull over at a Wendy's on Seawall and let him out. Sheffield was arrested next to her car within sight of that Wendy's. The material testimony offered by the State is summarized below.

### a. Benjamin Mills

An acquaintance of Sheffield's, Benjamin Mills, testified that he and Sheffield lived in the same boarding house in Galveston on the date of Sheffield's arrest (Dkt. 62-7 at pp. 19–20). That morning, Mills was sitting on the porch of the boarding house when Sheffield walked up to him with a beer in her hand (Dkt. 62-7 at p. 21). The two sat and

---

[1] Sheffield had little choice but to concede her intoxication—a mandatory blood draw revealed her blood alcohol level to be well over three times the legal limit (Dkt. 62-9 at p. 96; Dkt. 62-13 at pp. 3, 7). The mandatory blood draw was performed because Sheffield refused to provide a breath sample and had prior DWI convictions (Dkt. 62-8 at p. 118; Dkt. 62-13 at pp. 4, 6). *See* TEX. TRANSP. CODE § 724.012(b).

talked for a while, during which time Mills went to a nearby store and got a beer of his own (Dkt. 62-7 at pp. 22, 31–32). Sheffield then told Mills that she was going to the liquor store and offered him a ride in her car, which he accepted (Dkt. 62-7 at p. 22). Sheffield drove Mills to the liquor store, where Sheffield bought "some kind of a liquor, like whiskey" and began drinking it in the parking lot (Dkt. 62-7 at pp. 23, 31). After drinking in the liquor store parking lot for approximately ten or fifteen minutes, Sheffield pulled onto Seawall heading west (Dkt. 62-7 at pp. 23–24).

Sheffield cruised west "like she was sightseeing" until Mills began "trying to get [Sheffield] to take [him] back to the house because [he] had to get ready to go to work" (Dkt. 62-7 at pp. 24–25). Sheffield then turned around and started driving back east on Seawall in a manner that was "real fast" and "kind of reckless"—running red lights and "swerving between the lanes and, you know, like dodging cars and stuff" (Dkt. 62-7 at pp. 25–27, 32). Because there were "quite a few" cars on the road and he was afraid of getting into a car wreck, Mills asked Sheffield to pull into a Wendy's on Seawall so that he could get out (Dkt. 62-7 at pp. 26–28). Sheffield pulled into the Wendy's parking lot going the wrong way (meaning she entered through the parking lot's exit lane) and "nicked" a car in the parking lot (Dkt. 62-7 at pp. 34, 36). Mills got out of the car at Wendy's, and Sheffield "drove and left" (Dkt. 62-7 at p. 27).

### b. Kenneth Edward

Kenneth Edward testified that, on the day of Sheffield's arrest, he turned onto Seawall from the parking lot of a Kroger grocery store and began heading east (Dkt. 62-8 at pp. 6–7). He pulled into the right lane, and when he looked in his rear-view mirror he

saw a gray Honda Passport[2] "coming at an enormous amount of speed" in the left lane (Dkt. 62-8 at pp. 7, 34). Edward veered off of Seawall into an adjacent parallel parking lane[3] "so the vehicle wouldn't sideswipe [him] or run into [him]" (Dkt. 62-8 at p. 7). While in the parking lane, Edward saw other cars ahead swerving to avoid being hit by the same Passport, which continued "traveling at a high rate of speed" down Seawall until Edward quickly "lost sight of [it]" (Dkt. 62-8 at pp. 10–11). Edward pulled out of the parking lane and continued east down Seawall (Dkt. 62-8 at p. 10). He caught up to the Passport while the Passport was sitting at a red light, and he called 911 (Dkt. 62-8 at p. 11). When the light turned green, the Passport began moving through the intersection "at a slow rate of speed[,]" drove "about . . . halfway up the block," and then suddenly "just took off real fast [and] made a left turn . . . in the Wendy's exit" (Dkt. 62-8 at p. 14).

Still on the phone with the 911 dispatcher, Edward "turned on 24th Street which runs parallel to the exit of Wendy's" and stopped (Dkt. 62-8 at pp. 16–18). The Passport entered the Wendy's drive-through lane going the wrong way "pretty fast" and came "within inches" of striking another car head-on, though the two cars averted a serious collision because "[a]t the last minute they both slammed on their brakes" (Dkt. 62-8 at p. 16). The Wendy's drive-through customer got out of his car, at which point the Passport "backed up and jumped up on the curb" between the other car and the Wendy's building to get around the other car (Dkt. 62-8 at p. 16). As the Passport went around the other car, the driver of the other car had to "[take] a couple quick steps to the back of his vehicle to

---

[2] Sheffield owned a Honda Passport at the time (Dkt. 62-9 at p. 147).

[3] Parking lanes run adjacent to Seawall Boulevard so that people can parallel park along Galveston's seawall without obstructing the regular traffic lanes (Dkt. 62-8 at p. 9).

the trunk part" to avoid being struck by the Passport (Dkt. 62-8 at pp. 16–19). The Passport then continued going the wrong way through the Wendy's drive-through lane until it rounded the building "and came out, you know, the entrance part" (Dkt. 62-8 at p. 19). Edward caught a glimpse of the driver; he "noticed that it was a white—at that time [he] thought it was a white guy, Caucasian guy" (Dkt. 62-8 at p. 20).

Edward rounded the block and pulled back onto Seawall, again going east (Dkt. 62-8 at pp. 20–21). The Passport was parked on Seawall facing east, and Edward told the 911 dispatcher that the car had pulled over (Dkt. 62-8 at p. 21). Edward drove past the Passport, and when he did he saw a man walking up to the Passport's passenger-side window (Dkt. 62-8 at pp. 21–22). The driver, whom Edward identified as Sheffield at trial, was still in the Passport's driver's seat (Dkt. 62-8 at pp. 22, 37, 40). Edward rounded another block and came back down Seawall, this time headed west (Dkt. 62-8 at p. 22). He drove by the Passport again, and this time he saw a police car behind the Passport and "three people standing there, you know, on the Seawall, two people with a patrol officer" (Dkt. 62-8 at p. 22). One of the two people standing with the police officer was the driver, Sheffield; the other appeared to Edward to be the man who had approached the Passport's passenger-side window a few moments before (Dkt. 62-8 at pp. 22–23, 40).

### c. William Wilkinson

William Wilkinson owned an air-conditioning and heating business and was a former deputy sheriff who still held a license from the Texas Commission on Law Enforcement (Dkt. 62-8 at pp. 51, 69). On the day of Sheffield's arrest, Wilkinson was in

Galveston for a conference and vacation with his wife and another couple, and the four were in a pickup driven by Wilkinson's friend (Dkt. 62-8 at pp. 52–53). The pickup was stopped at a red light facing south, waiting to turn onto Seawall (Dkt. 62-8 at p. 52). When the light turned green, Wilkinson's friend began to enter the intersection; but Wilkinson told his friend to stop the pickup because he saw another vehicle traveling down Seawall "at a high rate of speed" that looked like "it wasn't going to stop" (Dkt. 62-8 at p. 52).

The other vehicle did indeed run the red light, and Wilkinson's friend turned left onto Seawall and followed it (Dkt. 62-8 at p. 53). As his friend's pickup followed the other vehicle down Seawall, Wilkinson observed that the other vehicle "failed to maintain a single lane of traffic multiple times, almost rear-ended several different vehicles[, and] would stop at a green light and run the red lights, or attempt to run—slide through the red lights" (Dkt. 62-8 at p. 53). The other vehicle then made a left turn into a Wendy's parking lot when it did not have the right of way, forcing "oncoming traffic [to] come to a complete stop" (Dkt. 62-8 at p. 54). When the car entered the Wendy's parking lot, Wilkinson saw a passenger get out (Dkt. 62-8 at pp. 54, 58). Wilkinson told his friend to pull over on Seawall, and Wilkinson got out of the pickup so that he could try to flag the other car down (Dkt. 62-8 at pp. 58–59).

As the other vehicle pulled out of the Wendy's parking lot back onto Seawall, Wilkinson flagged it down, and it pulled over on Seawall facing east (Dkt. 62-8 at pp. 59–60). The driver, whom Wilkinson identified as Sheffield at trial, rolled the windows down, and Wilkinson walked up to the passenger-side window and asked Sheffield for

her keys (Dkt. 62-8 at pp. 60, 63). At first, the keys would not come out of the ignition because the vehicle was still in drive, and Wilkinson had to tell Sheffield to put her vehicle in park (Dkt. 62-8 at pp. 60–61). After getting the vehicle into park, Sheffield gave Wilkinson her keys but immediately asked him to give them back (Dkt. 62-8 at p. 61). When Wilkinson refused to return the keys and instead put them in his pocket, Sheffield got out of her car and began yelling at him and striking him (Dkt. 62-8 at pp. 61–62). Police officers arrived "[v]ery quickly" after Sheffield began trying to get her keys back (Dkt. 62-8 at p. 62).

### d. Rogelio Franco

Rogelio Franco was a patrol officer for the Galveston Police Department (Dkt. 62-8 at p. 98). He arrested Sheffield on suspicion of driving while intoxicated after responding to a call "in reference to a reckless driver that had struck several vehicles" at a Wendy's on Seawall (Dkt. 62-8 at p. 99). After getting the call, Franco drove south down a street that intersected Seawall near the Wendy's (Dkt. 62-8 at p. 99). When he got to the intersection with Seawall, he saw a gray Honda Passport parked in a no-parking zone "in the middle of the intersection" and "observed a female approaching a male" (Dkt. 62-8 at pp. 99–101, 106). Franco got out of his patrol car, and the man (whom Franco later identified as Wilkinson) gave him a set of car keys that he had gotten from the woman (Dkt. 62-8 at pp. 103–04; Dkt. 62-9 at pp. 13–14). Franco noted that the woman showed numerous signs of intoxication, including a strong odor of alcohol on her breath; red, bloodshot, glassy eyes; a blank, glazed look on her face; slurred speech; a loud tone of voice; an argumentative demeanor; and the inability to stand without swaying or walk

without staggering (Dkt. 62-9 at p. 9). The woman also admitted to drinking alcohol and had an open container of alcohol in her vehicle (Dkt. 62-9 at p. 9). Franco arrested the woman, whom he identified at trial as Sheffield (Dkt. 62-8 at 104–05).

After the jury found her guilty, Sheffield appealed, arguing that there was insufficient evidence to sustain the jury's finding that she used her car as a deadly weapon and that the trial judge erred by limiting her cross-examination of Wilkinson. The First Court of Appeals of Texas affirmed. *See Sheffield v. State*, No. 01-12-00209-CR, 2013 WL 5638878 (Tex. App.—Houston [1st Dist.] Oct. 15, 2013, pet. ref'd). The Texas Court of Criminal Appeals denied discretionary review. *See* Texas Court of Criminal Appeals Case Number PD-1661-13. Sheffield pursued collateral review by filing a state habeas petition, which the Texas Court of Criminal Appeals denied without opinion. *See* Texas Court of Criminal Appeals Case Number WR-81,746-01.

Sheffield then filed this federal habeas petition. She has brought numerous grounds for relief, though they all fall into one of three categories: (1) claims that her conviction was supported by insufficient evidence; (2) claims that her trial lawyers provided ineffective assistance; and (3) a claim that her rights under the Sixth Amendment's Confrontation Clause were violated by the trial judge's limitations on cross-examination of Wilkinson.

## II.    STANDARDS OF REVIEW

### A.    Habeas Corpus

Sheffield's federal habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Lindh v. Murphy*, 117 S. Ct. 2059, 2068 (1997). The intent of the AEDPA is to avoid federal habeas "retrials" and "ensure that state-court convictions are given effect to the extent possible under [the] law." *Bell v. Cone*, 122 S. Ct. 1843, 1849 (2002).

The provisions of Section 2254(d) create a highly deferential standard, thereby demanding that state court decisions be given the benefit of the doubt. *Woodford v. Visciotti*, 123 S. Ct. 357, 360 (2002). A federal court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's decision:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

"Pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2)." *Martin v. Cain*, 246 F.3d 471, 475–76 (5th Cir. 2001) (quotation marks omitted).

A state court decision is contrary to clearly established law if the decision contradicts the governing law set forth by the Supreme Court or if the state court decides a case differently than the Court's precedent when the facts are materially

indistinguishable. *Early v. Packard*, 123 S. Ct. 362, 365 (2002). A state court unreasonably applies federal law if the court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000). To be an unreasonable application of federal law, the state court decision must be objectively unreasonable and more than simply incorrect or erroneous. *Lockyer v. Andrade*, 123 S. Ct. 1166, 1174 (2003).

Because the AEDPA grants great deference to state determinations of factual issues, a claim adjudicated on its merits in state court and based on factual decisions will not be overturned on factual grounds unless the court determines that the decision was both incorrect and objectively unreasonable. *Williams*, 120 S. Ct. at 1522. In reviewing a federal habeas petition, the court must presume that a factual determination made by the state court is correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**B.    Summary Judgment**

A court may grant summary judgment when the evidence shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986). The moving party has the responsibility of informing the court of the basis for its summary judgment motion and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . .'" that demonstrate that there is no genuine issue of material fact. *Celotex*, 106 S. Ct. at 2553. In response, the nonmovant must go beyond the pleadings and by affidavits, depositions,

answers to interrogatories, or admissions on file show that there is a genuine issue of material fact requiring resolution through a trial. *Id.* If the nonmoving party is unable to meet this burden, the motion for summary judgment will be granted. FED. R. CIV. P. 56(c).

Rule 56 of the Federal Rules of Civil Procedure "applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). The rule, however, only applies to the extent that it does not conflict with the habeas rules. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds*, *Tennard v. Dretke*, 124 S. Ct. 2562 (2004). Generally, in ruling on a motion for summary judgment, the court resolves any doubts and draws any inferences in favor of the nonmoving party—*Hunt v. Cromartie*, 119 S. Ct. 1545, 1551–52 (1999)—but 28 U.S.C. § 2254(e)(1) commands that factual findings of the state court are to be presumed correct. Thus, 28 U.S.C. § 2254(e)(1) overrides the general summary judgment rule. *Smith*, 311 F.3d at 668. The petitioner is required to rebut the presumption of correctness by clear and convincing evidence; otherwise, the court will presume the factual determination of the state court is correct. *Id.*; 28 U.S.C. § 2254(e)(1).

### III.  SUFFICIENCY OF THE EVIDENCE

#### a.  The Constitutional standard and the essential substantive elements

Sheffield's petition is often very difficult to understand, but the Court first divines a challenge to the sufficiency of the evidence used to convict her. In order to obtain habeas relief on this ground, Sheffield must show that, "upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The evidence is viewed in the light most favorable to the prosecution. *Id.* at 319. The essential substantive elements of the criminal offense are established by the state's criminal law. *Id.* at 324 n.16; *Hughes v. Johnson*, 191 F.3d 607, 619 (5th Cir. 1999).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors draw reasonable inferences from basic facts to ultimate facts." *Coleman v. Johnson*, 132 S.Ct. 2060, 2064 (2012) (quotation marks omitted). "[T]he only question . . . is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Id.* at 2065. The prosecution is not "under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt[,]" and the evidence of guilt is not insufficient simply because the record might support conflicting inferences. *Jackson*, 443 U.S. at 319, 326. In fact, the resolution of conflicting inferences and hypotheses is perhaps the factfinder's most important role, and one that *Jackson* took great pains to preserve. *See id.* ("This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."); *see also Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991) ("Under *Jackson*, we may find the evidence sufficient to support a conviction even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence.").

Sheffield was convicted under Section 49.04 of the Texas Penal Code. A person commits an offense under that statute when he or she "is intoxicated while operating a

motor vehicle in a public place." TEX. PENAL CODE § 49.04(a). "'Intoxicated' means . . . not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body[.]" TEX. PENAL CODE § 49.01(2)(A). DWI is a strict-liability crime in Texas; the State does not have to prove a specific culpable mental state such as intent, recklessness, or knowledge. *Farmer v. State*, 411 S.W.3d 901, 905 (Tex. Crim. App. 2013). The jury also found that Sheffield used her car as a deadly weapon. A "deadly weapon," under Texas law, can be: (1) anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (2) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX. PENAL CODE § 1.07(17). The Texas Court of Criminal Appeals has held that "[a] motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury. Specific intent to use a motor vehicle as a deadly weapon is not required." *Drichas v. State*, 175 S.W.3d 795, 797–98 (Tex. Crim. App. 2005) (citation omitted) (applying the *Jackson* standard and holding that a jury finding that the defendant used his car as a deadly weapon while evading police was adequately supported by evidence showing that the defendant "disregarded traffic signs and signals, drove erratically, wove between lanes and within lanes, turned abruptly into a construction zone, knocking down barricades as he did so, and drove on the wrong side on the highway" when there was other traffic on the road during the chase).

### b. Sheffield's claims under *Jackson* fail.

The evidence offered by the State was sufficient to support both the DWI conviction and the deadly-weapon finding. To begin with, Sheffield, as even she admitted, was clearly drunk on the day of her arrest. And the State presented more than enough evidence to allow a rational jury to conclude beyond a reasonable doubt that she not only drove her car in a public place that day but drove it in a way that was capable of causing death or serious bodily injury. Given the testimony summarized above, it was rational for the jury to conclude beyond a reasonable doubt that Sheffield, while intoxicated, drove wildly down Seawall, speeding and running red lights. It was also rational for the jury to conclude beyond a reasonable doubt that Sheffield almost hit several other cars driving down Seawall before almost colliding with incoming traffic while turning left into the parking lot of Wendy's, where she drove the wrong way down the drive-through lane and almost hit yet another car. The jury further could have rationally concluded beyond a reasonable doubt that, when the driver of the other car in the Wendy's drive-through lane exited his car, Sheffield almost ran that driver down.

In arguing otherwise, Sheffield mainly points to her own testimony, in which she claimed that Mills was driving her Passport and that she was only a passenger (Dkt. 62-9 at pp. 163–64). Sheffield claims that she is the victim of a slipshod investigation (Dkt. 1 at pp. 17–18) and that her account of the day's events is corroborated by the following testimony of a patrol officer who arrived on the scene after Franco and briefly talked to Mills in the Wendy's parking lot after Franco had taken Sheffield into custody:

| | |
|---|---|
| [Sheffield's counsel]: | This gentleman, was it Benny [Mills], a guy named Benny? |
| [Officer]: | Yes, ma'am. |
| Q: | He told you he was in that vehicle with the driver, did he not? |
| A: | Yes, ma'am. |
| Q: | Did you ask him what the hell he was doing over here at Wendy's? |
| A: | I asked him what he was doing at Wendy's. He said that he got out of the car when she [Sheffield] got into some kind of confrontation. |
| Q: | Did you smell alcohol on him? |
| A: | I didn't get close enough to smell anything on him. |
| Q: | Did you take him—did you think to—he's an eyewitness supposedly, right? |
| A: | Yes, ma'am. |
| Q: | He was actually in the vehicle? |
| A: | Yes, ma'am. |
| Q: | He is a key witness to any investigation, whether it's reckless driving or DWI or leaving a scene of an accident, correct? |
| A: | Yes, ma'am. |
| Q: | Did you handle him as a proper witness? |
| A: | No, ma'am. Not from what you're saying, no, ma'am. |
| Q: | Did you take him back over? |

| A: | No, ma'am. |
|---|---|
| Q: | Did you question him anything about it? |
| A: | No. I just had the recorder on. And everything I asked him, I was hoping the recorder picked him up. |
| Q: | As far as you knew, he could have been driving the car? |
| A: | Yes, ma'am. |
| Q: | Do you regret not writing a report, taking him in and interviewing him? |
| A: | Yes, ma'am. |

Dkt. 62-9 at pp. 128–29.

These statements do not come close to exposing the jury's decision to convict Sheffield as irrational. Contrary to Sheffield's contentions, the record does not reveal that this officer (or any other investigator) ever had any concrete reason to believe that anyone other than Sheffield was driving Sheffield's Passport. Even if, for the sake of argument, the statements quoted above constitute an admission by the officer that he could have more thoroughly investigated the possibility that Mills was the driver, the jury did not act irrationally in assigning that admission negligible weight given the overwhelming credible evidence against Sheffield.

Sheffield's other contentions under *Jackson* rest on what she claims is the insufficient credibility of the State's witnesses. To the extent that they are comprehensible, Sheffield's arguments highlight inconsequential points, such as that Edward did not describe the driver to the 911 dispatcher and that Wilkinson and Edward

both told police that Sheffield's vehicle struck several cars in the Wendy's parking lot when the evidence at trial indicated only that her Passport might have bumped one car and likely did not hit any (Dkt. 1 at pp. 18–19). Assessing the credibility of the witnesses and resolving conflicts in the testimony are the jury's jobs. Nothing in this record indicates that the jury in Sheffield's case reached an irrational or insupportable conclusion.

## IV.   INEFFECTIVENESS OF TRIAL COUNSEL

### a.  The Constitutional standard

Sheffield's claims of ineffective assistance of counsel are governed by the well-established, and demanding, standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail under *Strickland*, a criminal defendant must show that counsel failed to act reasonably considering all the circumstances and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment; and the defendant cannot meet the "reasonable probability" standard without showing a substantial, as opposed to conceivable, likelihood of a different result. *Id.* Review of *Strickland* claims on federal habeas is "doubly deferential" because the *Strickland* standard is applied in tandem with the approach commanded by 28 U.S.C. § 2254(d). *Id.* As the Supreme Court puts it, this Court must therefore "take a highly deferential look at counsel's performance through the deferential lens of 2254(d)." *Id.* (quotation marks and citations omitted). The prejudice

prong of the *Strickland* test may be addressed before the performance prong, as the absence of either prong is dispositive. *Strickland*, 466 U.S. at 697.

### b. Sheffield has not met the *Strickland* test.

#### 1. Franco's police report

Sheffield's primary complaint under *Strickland* is that her attorneys should have objected when the trial judge did not send Franco's written police report back to the jury deliberation room (Dkt. 1 at p. 12). During deliberations, the jury sent a note to the trial judge requesting the following items: (1) The 911 tapes; (2) Franco's dash camera video; (3) Franco's police report; and (4) "Wilkinson's testimony" (Dkt. 62-10 at p. 41). In response, the trial judge provided the 911 tapes and dash camera video and, with regard to Wilkinson's testimony, instructed the jury regarding Article 36.28 of the Texas Code of Criminal Procedure[4] (Dkt. 62-10 at pp. 41–42). However, the judge informed the jury that Franco's written police report could not be provided since it was not admitted into evidence during the trial (Dkt. 62-10 at p. 41). Before sending his response to the jury, the trial judge asked the State and Sheffield if either had any objections; neither did (Dkt. 62-10 at p. 42). Sheffield insists that her attorneys erred in not objecting because Franco's report had in fact been admitted into evidence and would have been very damaging to the prosecution's case (Dkt. 1 at pp. 12, 14, 16–17, 19–20, 23–24). Sheffield's belief that

---

[4] That provision reads: "In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other; but if there be no such reporter, or if his notes cannot be read to the jury, the court may cause such witness to be again brought upon the stand and the judge shall direct him to repeat his testimony as to the point in dispute, and no other, as nearly as he can in the language used on the trial."

Franco's police report was part of the admitted evidence in her trial is based on the fact that the police report was incorporated by reference into one of the prosecution's exhibits (Dkt. 1 at p. 23). Despite the incorporation by reference, the police report was not attached to the admitted exhibit (Dkt. 62-13 at p. 3) and is not included among the trial exhibits compiled by the court reporter in the trial court.

Even if Sheffield is correct in arguing that Franco's police report should have been sent back to the jury,[5] the *Strickland* test is not satisfied. A copy of the police report is attached to Sheffield's federal habeas petition (Dkt. 1 at p. 24), and the report neither damages the prosecution's case nor helps Sheffield's. Sheffield contends that Franco's police report somehow impeaches Wilkinson's trial testimony; but she bases that contention on inconsequential, almost undetectable differences between that testimony and Franco's report. For instance, Sheffield points out that Franco's report does not say that Wilkinson flagged Sheffield's car down; rather, it simply says that Sheffield "pulled over" before handing Wilkinson her car keys (Dkt. 1 at p. 24). This distinction is immaterial and casts no doubt on Wilkinson's testimony that Sheffield was driving and that he took her keys away from her. Sheffield also argues that Franco's report implies that Wilkinson, as opposed to his friend, was driving the pickup in which Wilkinson was riding (Dkt. 1 at pp. 23–24). The Court does not see any implication in Franco's report that Wilkinson was driving, but it does not matter if he was. Franco's report does not call into question the veracity of Wilkinson's trial testimony.

---

[5] The Court could not find any helpful Texas cases and is simply assuming without deciding that Franco's police report was in evidence under Texas law because it was incorporated by reference into the other exhibit.

Sheffield also claims that Franco's report would have created reasonable doubt in the jurors' minds because the report lists the wrong license plate number (MPJ918, one character off from Sheffield's license plate number, MCJ918) for Sheffield's car (Dkt. 1 at pp. 14, 24). Sheffield argues that Wilkinson provided the 911 dispatcher with the same wrong license plate number that Edward did, proving that Wilkinson, a former deputy sheriff, was listening to Edward's 911 call on a police-band radio while shopping with his wife and was not, as he testified, riding in a pickup following Sheffield's car (Dkt. 1 at p. 14). Franco's police report, like the rest of the record, contains absolutely no evident support for this theory, which Sheffield's counsel briefly mentioned during closing arguments (Dkt. 62-10 at pp. 15–16). The report does not mention Edward at all, much less tie him to Wilkinson. Franco's report does, however, bolster the prosecution's evidence showing that Franco pulled up to Sheffield's car on Seawall to find an intoxicated Sheffield trying to get her car keys back from Wilkinson, who was trying to prevent Sheffield from driving any further (Dkt. 1 at p. 24).

Franco's report would have provided no apparent aid to Sheffield and a significant amount of help to the State. It was not an unreasonable move for Sheffield's lawyers to allow the trial judge to keep Franco's report from the jury; and Sheffield has not shown a conceivable likelihood, let alone a substantial one, that she would have been acquitted had the jury seen that report.

### 2. Additional investigation

Sheffield also claims that her attorneys did not conduct an adequate pretrial investigation (Dkt. 1 at pp. 13–15). The ground for relief is, again, difficult to understand,

but Sheffield seems to be saying that more extensive investigation would have provided more evidence with which to impeach Wilkinson and more evidence with which to buttress Sheffield's defense that she was not driving (Dkt. 1 at pp. 13–15). Sheffield's claims fail. "An applicant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quotation marks omitted). Sheffield's claims do not provide the requisite detail. Moreover, Sheffield's lawyers did uncover evidence with which to impeach Wilkinson— they attempted (though, as discussed below, the trial judge stymied them) to establish that Wilkinson had been fired from the Harris County Sheriff's Department for ethical and legal infractions (Dkt. 62-8 at pp. 45–50, 76–78, 80). Sheffield's lawyers also impeached Edward with prior felony convictions (Dkt. 62-8 at pp. 24–26). Sheffield is not entitled to relief on this ground.

### 3. Generally unprofessional conduct

Sheffield also claims that her attorneys provided representation that was generally unprofessional, doing things such as dressing inappropriately for court; referring to Sheffield as the driver in front of the jury; and misleading Sheffield regarding their qualifications (Dkt. 1 at pp. 14, 15, 25). None of these claims is specific enough to state a ground for relief, and none is supported by the record. Sheffield had two attorneys at trial. Both of them were court-appointed, and there is no sign that they misrepresented their qualifications to the judge (Dkt. 1 at p. 25). Sheffield's attorneys did not say that she was driving and in fact specifically argued that Mills was driving Sheffield's car (Dkt. 62-10

at pp. 7–26). The record contains no descriptions of Sheffield's attorneys' attire or any admonitions from the trial judge regarding their courtroom conduct. Actually, if anyone's conduct hampered Sheffield's defense, it was her own: Sheffield's determination to testify, against the advice of her attorneys, subjected her not only to a withering cross-examination but to impeachment with an indisputably admissible felony DWI conviction (her third conviction for DWI) from 2007, only four years before her arrest on Seawall (Dkt. 62-9 at pp. 143–84).

Sheffield is not entitled to relief on this ground. Her claims under *Strickland* fail.

## V.    THE CONFRONTATION CLAUSE

### a.  Sheffield's claims

Wilkinson, a former police officer, made clear during both direct examination and cross-examination that, on the day of Sheffield's arrest, he had not worked in law enforcement for six years (Dkt. 62-8 at pp. 51, 69). Sheffield's claims under the Confrontation Clause are premised on the trial judge's refusal to allow Sheffield's lawyers to question Wilkinson about his being convicted of a crime while employed as a sheriff's deputy and about the circumstances of his departure from the Harris County Sheriff's Department. Sheffield argues that her counsel should have been allowed to cross-examine Wilkinson about his career as a deputy sheriff in order to impeach his credibility by casting him as an overzealous "wanna-be cop" (Dkt. 62-8 at p. 77).

Just before Wilkinson took the stand, outside of the presence of the jury, Sheffield's counsel represented to the trial judge that Wilkinson had been convicted while serving as a sheriff's deputy of "public servant collecting debt," a Class C misdemeanor

(Dkt. 62-8 at p. 45).[6] The conviction was from 2005, six years before Sheffield's arrest (Dkt. 62-8 at p. 49). The trial judge ruled that the conviction was not admissible under Texas Rule of Evidence 609 governing impeachment by evidence of criminal convictions:

> [Trial judge]:  [M]y concern is that it has to be something like theft or moral turpitude.
>
> . . .
>
> But this is—a collection of a debt, it's not as if you were trying to take somebody's property that—without permission. It was something that you're trying to collect. I don't believe that it's moral turpitude, that it comes under that definition just based on what y'all have told me. So, I would sustain the objection to asking that question of that witness when it comes up.
>
> Dkt. 62-8 at pp. 47–48.

The trial judge also ruled that the conviction was not admissible under Texas Rule of Evidence 613(b) governing proof of a witness's bias or interest:

> [Prosecutor]:  Your Honor, I don't see how a Class C [misdemeanor] conviction in 2005 relates to any bias that this man has as a lay witness to an incident that happened in 2011.
>
> [The trial judge]:  And in this case which doesn't involve any debt collection or anything, does it?
>
> [Prosecutor]:  No, Your Honor.
>
> [The trial judge]:  My ruling still stands.
> Dkt. 62-8 at p. 49.

---

[6] Public records indicate that Wilkinson entered a guilty plea to this charge in Cause Number 104711301010-3 in the 232nd District Court of Harris County.

The examination of Wilkinson then began. During cross-examination, Sheffield's counsel asked Wilkinson whether he had "ever been fired from employment as a deputy" (Dkt. 62-8 at p. 76). The prosecutor asked if the parties could approach the bench, and at the ensuing bench conference Sheffield's counsel characterized her question as a permissible inquiry into Wilkinson's character for truthfulness or untruthfulness under Texas Rule of Evidence 608:

> [Sheffield's counsel]:    I didn't ask him about a specific incident of misconduct. I'm asking him—under the rules of 608 trying for truth and veracity, I have the right to impeach him on truth and veracity. If he's been fired as a deputy sheriff, that goes to his truth and veracity.
>
> . . .
>
> He's a wanna-be cop.

Dkt. 62-8 at pp. 76–77.

The judge disagreed:

> [Trial judge]:    I think the State's objection is good. I don't see how that has any bearing on this man's credibility, especially since I don't know whether he was actually fired as you—I think you started to ask that question. I don't even know what the answer would be. Even if he did, I think the circumstances of his leaving his employment, whether it's voluntarily or forced or fired, whatever it may have been, I don't think has any relevance to this case here or his testimony.

Dkt. 62-8 at pp. 77–78.

The trial judge instructed the jury to disregard Sheffield's counsel's question about whether Wilkinson had ever been fired from employment as a deputy (Dkt. 62-8 at p. 78).

Sheffield's lawyers clearly thought that probing into Wilkinson's tenure with and departure from the Harris County Sheriff's Department would help them paint Wilkinson as a heedless "wanna-be cop" willing to lie to secure a conviction for Sheffield. It is obvious exactly what evidence Sheffield's counsel hoped the jury would hear: in his time as a deputy sheriff, Wilkinson, aside from pleading guilty to being a "public servant collecting debts," also shot two men, killing one, in separate incidents that led to civil rights lawsuits. Wilkinson claimed self-defense both times, and both lawsuits were dismissed. *See James v. Harris County*, 577 F.3d 612 (5th Cir. 2009); *Barkley v. Dillard Dep't Stores, Inc.*, 277 Fed. App'x 406 (5th Cir. 2008).[7] It does not appear that Wilkinson was ever indicted for either shooting. Sheffield's counsel referred to the shooting incidents in her attempt to convince the trial judge to allow her to delve into Wilkinson's law enforcement career (Dkt. 62-8 at p. 77).

### b. The applicable law

The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, which encompasses a defendant's rights under the Confrontation Clause to rebut the State's evidence through cross-examination. *Kittelson v. Dretke*, 426 F.3d 306, 318–19 (5th Cir. 2005). The right to cross-examination includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or

---

[7] In the *James* case, the plaintiffs voluntarily dismissed their claims against Wilkinson and proceeded only against Harris County. *See* Southern District of Texas Case Number 4:04-CV-3576 at Dkt. 241. In the *Barkley* case, the claims against Wilkinson were dismissed as time-barred. *See* Southern District of Texas Case Number 4:06-CV-843 at Dkt. 69. Judgment as a matter of law was eventually granted on all claims against all other defendants in both cases, though the claims against Harris County in *James* went to a jury trial in which the jurors deadlocked on the threshold issue of whether Wilkinson used excessive force.

unbelievable. *Id.* at 319. However, the Confrontation Clause does not guarantee defendants cross-examination to whatever extent they desire—a trial judge has discretion to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant. *Id.* "In determining whether the exclusion of evidence violates a defendant's confrontation rights, the Supreme Court has identified the following factors for a reviewing court to consider:" (1) the strength of the prosecution's overall case; (2) the importance of the witness's testimony in the prosecution's case; (3) whether the testimony was cumulative; (4) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; and (5) the extent of cross-examination otherwise permitted. *Id.*

Before a federal court may grant habeas relief on the basis of a violation of the Confrontation Clause, the court must apply the *Brecht* harmless-error standard. *Id.* at 319–20. Under that standard, the petitioner must establish that the violation of the Confrontation Clause had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (quotation marks omitted). It is not enough to show "merely [that] there is a 'reasonable possibility' that [the Confrontation Clause violation] contributed to the verdict[.]" *Id.* at 637 (quotation marks omitted).

### c. Sheffield has neither established a Confrontation Clause violation nor satisfied the *Brecht* standard.

Sheffield is not entitled to relief on her Confrontation Clause ground. First, she has not established that her rights under the Confrontation Clause were violated by the trial judge's refusal to permit cross-examination of Wilkinson regarding his record as a police officer. The prosecution's overall case against Sheffield was very strong; and Wilkinson's testimony, while helpful and important, was not all the State had. Wilkinson's testimony that Sheffield was driving, and driving dangerously, was corroborated by Mills and Edward; and Franco testified that he pulled up to Sheffield's vehicle to see an intoxicated Sheffield trying to get her car keys back from Wilkinson, just as Wilkinson described. In addition, Sheffield was allowed to question Wilkinson thoroughly regarding, among other things, his inability to estimate the speed at which Sheffield's Passport was traveling; his inability to describe the passenger who exited the Passport at Wendy's; and his meetings with the prosecution prior to trial (Dkt. 62-8 at pp. 67–94, 96–97). The jury also heard on cross-examination that Wilkinson was a layperson who was no longer a working police officer; he had been out of law enforcement for six years, after a 15-year career as a deputy sheriff, on the day of Sheffield's arrest (Dkt. 62-8 at p. 69).

Just as importantly, Wilkinson's record as a police officer alone does not, in the first place, suggest a specific bias in favor of the prosecution or a motive to lie about or exaggerate Sheffield's actions. For instance, there is no indication that Wilkinson received or expected to receive anything (such as consideration for reinstatement as a

Harris County deputy) for his testimony. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 676 (1986) (holding that the defendant's rights under the Confrontation Clause were violated in a murder trial when a crucial prosecution witness's unrelated drunkenness charge was dropped in exchange for a promise to speak with the prosecutor about the murder and the defendant was not allowed to question the witness about the agreement). There is also no indication that Wilkinson needed, or thought he needed, to slant his testimony in order to deflect suspicion away from himself, or that his police service record somehow made him susceptible to pressure from the prosecution. *Cf. Davis v. Alaska*, 415 U.S. 308, 316–18 (1974) (holding that the defendant's rights under the Confrontation Clause were violated in a trial for theft of a safe from a bar when the defendant was not allowed to show that a crucial prosecution witness was on probation for burglary during the police investigation, a fact that was "admissible to afford a basis for an inference of undue pressure [by the prosecution] because of [the witness's] vulnerable status as a probationer . . . as well as of [the witness's] possible concern that he might be a suspect in the investigation"). In other words, the information that Sheffield sought to put before the jury was not designed to show bias, prejudice, or ulterior motive on the part of Wilkinson—it was entirely an attempt to attack Wilkinson's general credibility. The Fifth Circuit has held that there is no right under the Confrontation Clause to impeach the general credibility of a witness. *United States v. Skelton*, 514 F.3d 433, 445 (5th Cir. 2008), *cert. denied*, 555 U.S. 820 (2008) ("[A]lthough Rule 608 permits the impeachment of the general credibility of a witness, there is no constitutional right to do so."); *see also Cloud v. Thomas*, 627 F.2d 742, 743–44 (5th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981) ("There was no

suggestion either before the state court or this court that cross-examination [regarding an unrelated incident of false reporting by the arresting officer] would show any biases, prejudices, or ulterior motives on the part of the officer, or that cross-examination would accomplish anything more than a refutation of the officer's credibility.") (quotation marks and citation omitted).[8]

Even assuming that there was a Confrontation Clause violation, Sheffield has not established that the violation had a substantial and injurious effect or influence in determining the jury's verdict. The prosecution's evidence against Sheffield was simply too strong overall for a guilty verdict to have hinged on Wilkinson—the fourth of the State's seven witnesses and one of three witnesses to put Sheffield behind the wheel of her car on the morning of her arrest—to a degree sufficient to satisfy the *Brecht* standard. *Cf. Wilkerson v. Cain*, 233 F.3d 886, 892 (5th Cir. 2000) ("As emphasized above, the

---

[8] *Cloud* distinguishes its facts from those of a Sixth Circuit case, *United States v. Garrett*, 542 F.2d 23 (6th Cir. 1976), and the contrast between the two is instructive. In *Cloud*, a man arrested for public lewdness attempted to impeach the prosecution's sole witness, the arresting officer, with evidence that the officer had filed a false report in an unrelated vice undercover operation. *Cloud v. Thomas*, 627 F.2d 742, 743 (5th Cir. 1980). The Fifth Circuit held that the trial judge's exclusion of that evidence did not implicate the Confrontation Clause because the evidence did not prove that the officer had any incentive to lie in that particular case; instead, it only tended to establish "the general inference, of limited probative value, that those who lie once may lie twice." *Id.* at 744–45. In *Garrett*, on the other hand, the arresting officer, who was as in *Cloud* the prosecution's key witness, was under suspension at the time of trial for refusing to take a urine test to determine whether he had used narcotics. *Garrett*, 542 F.2d at 24. Since the defendant in *Garrett* was on trial for *selling* narcotics *to* that officer, the Sixth Circuit held that "the jury was entitled to know that the witness who had accused Garrett of arranging the sale of heroin had been suspended because he was suspected of using hard drugs himself and had refused to submit to a urine test." *Id.* at 26. The Sixth Circuit also noted that the officer "might well have looked upon a successful prosecution of Garrett as a means of having his suspension lifted and being returned to full duty as a police officer." *Id.* The circumstances surrounding Wilkinson's testimony are much more like those addressed in *Cloud*: the evidence about Wilkinson's police service record that Sheffield sought to introduce would not have shown that Wilkinson had a particular reason to misrepresent the facts in DWI cases in general or in her case in particular.

prosecution's case hinged on Riley's supposed eyewitness account of Kelly's murder. There was *no* other evidence, physical or otherwise, that connected Wilkerson to the crime. Had the jury believed that Riley was testifying to curry favor with the state, or that he expected some real or perceived benefit in return, the state's case would have been seriously undermined.") (emphasis in original). The Court does not see even a "reasonable possibility" that the exclusion of the evidence about Wilkinson's past contributed to the jury's verdict, and Sheffield would have to show a lot more than that to obtain habeas relief. *Brecht*, 507 U.S. at 637–38.

The Court will dismiss Sheffield's petition.

## VI. CERTIFICATE OF APPEALABILITY

The federal habeas corpus petition filed in this case is governed by the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), codified as amended at 28 U.S.C. § 2253. Therefore, a certificate of appealability is required before an appeal may proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see also Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability).

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, a petitioner must show "that reasonable jurists could debate whether

(or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). After careful review of the pleadings and the applicable law, the Court concludes that reasonable jurists would not find its assessment of the claims debatable or wrong. Because the petitioner does not otherwise allege facts showing that her claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## VII. CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1.  The Respondent's motion for summary judgment (Dkt. 64) is **GRANTED**. All other motions are terminated as moot.

2.  The habeas corpus petition (Dkt. 1) is **DISMISSED WITH PREJUDICE.**

3.  A certificate of appealability is **DENIED**.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Galveston, Texas, on _____May 31_____, 2017.

George C. Hanks

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE